No. 2--06--0676     Filed: 10-10-07

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| LELAND STAHELIN and JES VENTURES, L.L.C., | ) | Appeal from the Circuit Court of Du Page County. |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | No. 05--MR--1426 |
| | ) | |
| THE FOREST PRESERVE DISTRICT OF DU PAGE COUNTY and MORTON ARBORETUM, | ) | |
| | ) | Honorable |
| | ) | Bonnie M. Wheaton, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE BYRNE delivered the opinion of the court:

Plaintiffs, Leland Stahelin and JES Ventures, L.L.C., are owners of an 18-acre parcel of land bordered on three sides by defendant Morton Arboretum (Morton). Plaintiffs wish to develop the property, and defendant the Forest Preserve District of Du Page County (the District) wishes to preserve the property in its current state, for the benefit of the public. Following negotiations to buy the subject property, which negotiations fell apart, and a suit for condemnation, which was dismissed by the District, plaintiffs brought this action against defendants, seeking: (1) a finding of inverse condemnation and the issuance of a writ of mandamus to initiate condemnation proceedings; (2) a finding of a violation of plaintiffs' substantive due process rights as a result of an alleged conspiracy between Morton and the District; (3) a declaration that certain ordinances approved by the District were ultra vires acts; and (4) the elimination of the cloud on plaintiffs' title to the property. The trial

court granted defendants' motions to dismiss the complaint pursuant to sections 2--615 and 2--619 of the Code of Civil Procedure (735 ILCS 5/2--615, 2--619 (West 2006)). Plaintiffs appeal the dismissal of their complaint against defendants. We affirm.

BACKGROUND

The following facts are taken from the allegations in plaintiffs' complaint and the attached documents. The 18-acre parcel of land owned by plaintiffs is in unincorporated Du Page County, and it is bordered on three sides by Morton, a private arboretum located in Lisle. On December 12, 2000, the District passed an enabling ordinance, No. 00--583 (Phase I ordinance), which authorized agents of the District to begin good-faith negotiations with plaintiffs for the purchase of their land. Morton previously had petitioned the District to consider condemning plaintiffs' land for the purpose of creating a forest preserve. According to plaintiffs' complaint, in the past Morton had attempted to purchase the property from plaintiffs.

The Phase I ordinance provided that plaintiffs could retain a life estate in the land if they wished. The Phase I ordinance set forth the public purpose and necessity for the acquisition. The ordinance provided that "if negotiations to acquire the subject properties through voluntary efforts are not successful, then the [District's] Director, staff, and attorneys are directed to prepare an ordinance authorizing acquisition of the subject property by condemnation." The ordinance further provided: "[I]f the natural flora and fauna of the subject property is threatened by demolition or destruction during good faith negotiations, the Forest Preserve District Executive Director, staff, and attorneys are authorized to take all steps necessary (including temporary restraining order and/or preliminary injunction) to preserve the property to the benefit of the public in its current state."

The good-faith negotiations did not result in agreement for acquisition of the land. On August 21, 2001, the District enacted another ordinance, No. 01--017 (Phase II ordinance), authorizing acquisition of the property through negotiation or condemnation. The Phase II ordinance also set forth the public purpose and necessity for the acquisition of plaintiffs' land.

On the same date, the District filed a complaint for condemnation (Forest Preserve District of Du Page County v. JES Ventures, L.L.C., No. 01--ED--84 (Cir. Ct. Du Page Co.)). The District filed a lis pendens as well. According to plaintiffs, law enforcement officials entered the property and informed plaintiffs not to remove any trees from the land.

On September 20, 2001, plaintiffs filed a traverse and motion to dismiss the condemnation complaint. This filing challenged the public purpose for which the District was condemning the land. The District contested the contentions in the traverse and motion to dismiss.

On April 20, 2004, the District voluntarily dismissed its condemnation action. In addition, the District enacted a third ordinance, No. 04--113 (Abandonment ordinance), which authorized the voluntary dismissal. The District board did not abandon the condemnation action because of lack of necessity for condemnation, stating in the Abandonment ordinance: "[A]lthough the Forest Preserve District continues to believe the fee simple acquisition of the property is important and necessary for the furtherance of the purposes set forth in this Ordinance, the [District] has determined that at this time, it is in the best interest of the [District] to abandon the acquisition of the property and dismiss the condemnation proceedings currently pending." The ordinance further provides that "the abandonment of the property from acquisition as granted by this Ordinance shall not constitute a finding that the [District] does not 'need' this property, and the [District] hereby expressly states

that the acquisition of the property in the future would be important to furthering the statutory purposes of the [District]."

After the complaint for condemnation was filed on August 21, 2001, plaintiffs made no improvement to the land, such as subdivision or development. "Fearing" the purposes set forth in the Abandonment ordinance, plaintiffs requested that the District delete that language from the Abandonment ordinance. The District refused to do so.

Five months after the District voluntarily dismissed the condemnation action, plaintiffs sought leave in the condemnation action to file claims against the District for declaratory relief, for lost use, and to quiet title. The trial court denied plaintiffs' motion.

Thereafter, on November 21, 2005, plaintiffs filed the instant action, consisting of four counts against the District and Morton, seeking: (1) inverse condemnation and the issuance of a writ of mandamus to initiate condemnation proceedings (count I); (2) a finding that plaintiffs' substantive due process rights were violated as a result of an alleged conspiracy between Morton and the District (count II); (3) a declaration that certain ordinances approved by the District were ultra vires acts (count III); and (4) an elimination of the cloud on plaintiffs' title to the property (count IV).

Defendants filed motions to dismiss pursuant to sections 2--615 and 2--619. In particular, Morton sought dismissal of count II, pursuant to section 2--619(a)(9) (735 ILCS 5/2--619(a)(9) (West 2006)), on grounds that the actions it took relative to the District's acquisition of plaintiffs' property were privileged and protected under the first amendment right to petition and the Noerr-Pennington doctrine. See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 5 L. Ed. 2d 464, 81 S. Ct. 523 (1961); United Mine Workers v. Pennington, 381 U.S. 657, 14 L. Ed. 2d 626, 85 S. Ct. 1585 (1965). Morton also argued, pursuant to section 2--615, that count II

did not properly state a claim for relief under section 1983 of the Civil Rights Act of 1964 (42 U.S.C. §1983 (2000)), due to a failure to sufficiently allege a deprivation of property rights or allege that Morton acted under color of state law. Morton further argued that plaintiffs' claim should be dismissed for failure to exhaust state remedies.

The District sought dismissal of all counts, pursuant to section 2--615, on grounds that: (1) no physical taking occurred; (2) plaintiffs failed to allege a deprivation of the use of the property; (3) plaintiffs failed to allege a deprivation of property rights; (4) the disputed District ordinances were facially valid; and (5) plaintiffs failed to allege that the ordinances gave the District a semblance of title to the property. The District sought dismissal pursuant to section 2--619(a)(9) on grounds that the District's actions were protected by its first amendment right and the Noerr-Pennington doctrine.

Following briefing and a hearing, the trial court granted defendants' motions to dismiss. The trial court dismissed count I, stating: "I don't believe there could possibly be an inverse condemnation where the use of the property is essentially unchanged; and at some future time, even though there is a specter of condemnation in the future and as such time as the property is subject to ordinance, I think the strong presumption has to be that the plaintiffs will be appropriately compensated if and when it actually takes place."

The trial court dismissed count II as to Morton on grounds that Morton's action of petitioning the government was privileged under the first amendment right to petition. As to the District, the trial court stated: "There cannot be a conspiracy to commit an unlawful act when one party is certainly within its rights to do exactly what it did; and I previously found that Morton Arboretum

was within its rights to petition the government. *** And I think the governmental body *** is charged with the obligation to listen to its constituents."

In dismissing count III, the trial court stated: "I think it's quite clear that the ordinance is within the lawful parameters of the statute by allowing the [District] to designate parcels of property which it believes [are] in the best interest to be targeted or placed on a wish list or however you want to describe it." As to count IV, the trial court said, "I believe that there has to be some color of title asserted in order for a quiet title action to be validly pled; and here, there is no assertion of title which could even remotely be constituted as a cloud upon the title."

The trial court granted plaintiffs 21 days in which to file an amended complaint. Plaintiffs did not file an amended complaint. Based on plaintiffs' decision to stand on their complaint, the trial court entered final judgment and dismissed plaintiffs' complaint with prejudice. Plaintiffs filed a timely notice of appeal.

ANALYSIS

On appeal, plaintiffs contend that the trial court erred in dismissing their complaint against Morton and the District. The legal theories differ for proceeding on a motion to dismiss under section 2--615 and section 2--619. "A section 2--615 motion attacks the legal sufficiency of the complaint by asserting that it fails to state a cause of action upon which relief can be granted." T&S Signs, Inc. v. Village of Wadsworth, 261 Ill. App. 3d 1080, 1083 (1994). "Under section 2--619, a party admits the legal sufficiency of the complaint but asserts an affirmative defense or other matter which avoids or defeats the claim." T&S Signs, Inc., 261 Ill. App. 3d at 1083. Similar to a motion brought under section 2--615, a motion to dismiss under section 2--619 admits all well-pleaded facts. Geick v. Kay, 236 Ill. App. 3d 868, 874 (1992). Whether the trial court has dismissed a complaint

pursuant to section 2--615 or section 2--619, our standard of review is de novo. Provenzale v. Forister, 318 Ill. App. 3d 869, 874 (2001). Mindful of the legal theories and the standard of review, we turn to the contentions raised by plaintiffs under each count.

Count I--Inverse Condemnation

Count I of plaintiffs' complaint seeks inverse condemnation. Plaintiffs allege that the District's enactment of the Phase I ordinance and the Abandonment ordinance resulted in a taking of plaintiffs' property without just compensation. We find that plaintiffs fail to state a cause of action for inverse condemnation because neither ordinance results in a cognizable "taking" of the property.

An inverse condemnation action is a proceeding by a landowner against a responsible government entity to compel the institution of eminent domain proceedings where there has been a taking without just compensation. Luperini v. County of Du Page, 265 Ill. App. 3d 84, 89 (1994). The takings clause of the fifth amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const., amend. V. The takings clause is made applicable to the states through the fourteenth amendment. Chicago, Burlington & Quincy R.R. Co. v. Chicago, 166 U.S. 226, 41 L. Ed. 979, 17 S. Ct. 581 (1897).

"A governmental taking of private property for public use can occur in different ways." Forest Preserve District of Du Page County v. West Suburban Bank, 161 Ill. 2d 448, 456 (1994). One manner of taking occurs when there is an actual physical invasion by the government onto an individual's property. Where there is even the slightest physical intrusion onto the property by the government, and despite any legitimate public purpose, a taking requiring just compensation has occurred. Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1015, 120 L. Ed. 2d 798, 812, 112 S. Ct. 2886, 2893 (1992).

A second manner of taking property occurs where governmental regulation radically curtails a property owner's rights such that "all economically beneficial or productive use of land" is denied. Lucas, 505 U.S. at 1015, 120 L. Ed. 2d at 813, 112 S. Ct. at 2893. Under this standard, only the most severe governmental regulation amounts to a taking requiring just compensation. The Supreme Court has recognized that governmental regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster, and such "regulatory takings" may be compensable under the fifth amendment. Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 67 L. Ed. 322, 326, 43 S. Ct. 158, 160 (1922).

Plaintiffs allege neither a direct governmental appropriation nor a physical invasion of their property. They point to certain language in the ordinances and assert that it amounts to a regulatory taking of their property because it places "drastic limitations *** upon the property."

Plaintiffs complain of the following section of the Phase I ordinance:

"[I]f the natural flora and fauna of the subject property is threatened by demolition or destruction during good faith negotiations, the [District] Executive Director, staff, and attorneys are directed to take all steps necessary (including temporary restraining order and/or preliminary injunction) to preserve the property to the benefit of the public in its current state."

Plaintiffs complain of the following sections of the Abandonment ordinance:

"[A]lthough the [District] continues to believe the fee simple acquisition of the property is important and necessary for the furtherance of the purposes set forth in this Ordinance, the [District] has determined that at this time, it is in the best interest of the [District] to abandon the acquisition of the property and dismiss the condemnation

proceedings currently pending. *** [T]he abandonment of the property from acquisition as granted by this Ordinance, shall not constitute a finding that the [District] does not 'need' this property, and the [District] hereby expressly states that the acquisition of the property in the future would be important to furthering the statutory purposes of the [District]."

Plaintiffs perceive that the ordinances prohibit them from developing the property at its highest and best use without facing condemnation proceedings and losing title to the property; force them to maintain the status quo and refrain from any development; freeze the use of the property to its existing use by rendering any development impossible; and freeze the use of the property to that of one single-family residence as opposed to an 18-acre residential subdivision. Although plaintiffs perceived and pled that the ordinances are drastic limitations, the interpretation of an ordinance is a question of law. See Hawthorne v. Village of Olympia Fields, 204 Ill. 2d 243, 252-53 (2003). Accordingly, we need not accept as true plaintiffs' subjective description of the ordinances' effects upon them. We need determine only whether the ordinances' regulation of plaintiffs' property is tantamount to a direct appropriation or ouster.

We first find that the Phase I ordinance is no longer operative. It authorized good-faith negotiations to be conducted prior to condemnation proceedings and, by its own language, it was limited in scope to the period in which such negotiations were ongoing. The sentence authorizing the procurement of a preliminary injunction or temporary restraining order specifically limits that authorization to a situation in which "the natural flora and fauna of the subject property is threatened by demolition or destruction during good faith negotiations." (Emphasis added.) Good-faith negotiations ended when the District filed a condemnation suit.

Further, by necessary implication, the Phase I ordinance was repealed by the Phase II ordinance, enacted August 21, 2001, and again by the Abandonment ordinance, enacted April 20, 2004. The Phase II ordinance authorized the filing of the condemnation action and therefore ended the good-faith negotiation phase previously authorized. The Abandonment ordinance directed the District's agents to formally abandon acquisition of plaintiffs' property. Because the District abandoned all efforts to acquire plaintiffs' property, including good-faith negotiations, the Phase I ordinance that authorized an injunction "during good faith negotiations" was rendered inoperative. See Provenzano v. City of Des Plaines, 256 Ill. App. 3d 458, 460 (1993) ("[g]enerally, the effect of repeal of an ordinance is to eliminate that ordinance as if it had never been enacted"). Accordingly, the Phase I ordinance does not give the District any standing authorization to seek an injunction if plaintiffs choose to develop the land.

A land-use regulation does not constitute a taking if it substantially advances legitimate state interests and does not deny any owner economically viable use of its land. National Advertising Co. v. Village of Downers Grove, 204 Ill. App. 3d 499, 512 (1990). Although the Abandonment ordinance is, strictly speaking, not the same as a legislative regulation, we will analyze it under the same standard for determining whether a taking has occurred.

The Abandonment ordinance does not amount to a regulatory taking of plaintiffs' property. It does not give the District any power to regulate, limit, or control plaintiffs' ability to use their land. It does not have any direct effect on plaintiffs' ability to develop their property. The statements in the ordinance that abandonment was not for lack of necessity or that acquisition of the land in the future would be important to furthering the statutory purposes of the District do not amount to anything the District can enforce against plaintiffs. Despite their apparent apprehension about the

language, the fact remains that the ordinance provides the District no enforcement mechanism to regulate plaintiffs' property. Plaintiffs' present possible uses of their land simply are not affected by the Abandonment ordinance.

In Byron Dragway, Inc. v. County of Ogle, 326 Ill. App. 3d 70 (2001), an ordinance restricted the plaintiff's racetrack from operating during the evenings and on weekends, when conducting races was most profitable. We held that this constituted a regulatory taking because, "[a]lthough a part of a business licensing scheme, the ordinance has the practical effect of limiting plaintiff's use of its property." Byron Dragway, 326 Ill. App. 3d at 76. Unlike the Abandonment ordinance, which imposes no limitations on plaintiffs' use of their property, the county in Byron Dragway could enforce a limitation on use by refusing to license the racetrack.

The Abandonment ordinance is similar to other regulations that courts have found not to effect regulatory takings. For example, in Davis v. Brown, 221 Ill. 2d 435 (2006), the supreme court considered whether section 4--510 of the Illinois Highway Code (605 ILCS 5/4--510 (West 2004)) constituted a regulatory taking. Section 4--510 authorizes the Illinois Department of Transportation (IDOT) to prepare and record maps that establish approximate locations of rights-of-way for future additions to the State highway system. Davis, 221 Ill. 2d at 438-39. The statute further prohibits any person who owns land on which a future right-of-way is located from developing or improving his or her land without first giving 60 days' notice to IDOT. Davis, 221 Ill. 2d at 439. IDOT then has 45 days to inform the landowner of IDOT's intention to acquire the land through purchase or eminent domain proceedings. IDOT then has an additional 120-day period either to purchase the property in a voluntary transaction or to initiate eminent domain proceedings. If the property is not acquired during this time, the landowner may proceed with development without restriction. However, while

IDOT decides what to do with the property--a reservation period that may last up to 165 days--development may not be pursued by the landowner. The supreme court held that this process did not constitute a regulatory taking. Davis, 221 Ill. 2d at 447. Relevant to the present case, the supreme court noted that IDOT's filing of a map indicating future rights-of-way was not a regulatory taking. Davis, 221 Ill. 2d at 448. Like the map, the statements in the Abandonment ordinance are at most planning in anticipation of a possible future taking and do not effect a taking itself. Further, unlike section 4--510, the Abandonment ordinance does not require plaintiffs to provide the District with notice before developing or improving their land. It does not give the District any option to purchase the land or acquire it through eminent domain proceedings.

Likewise, in Groenings v. City of St. Charles, 215 Ill. App. 3d 295 (1991), the plaintiffs owned land that they wanted the City of St. Charles to annex. St. Charles denied their petition and simultaneously entered into a boundary agreement with the Village of Wayne, where the plaintiffs' property was situated. The plaintiffs sued St. Charles, alleging that St. Charles's conduct, including the boundary agreement, constituted a taking of the plaintiffs' property by depriving them of the reasonable use of their property. We held that the boundary agreement did not constitute a taking because "the *** agreement affected only the way plaintiffs hoped to incorporate their land, not its present possible uses." (Emphasis in original.) Groenings, 215 Ill. App. 3d at 311. Similar to the boundary agreement in Groenings, the Abandonment ordinance does not affect the present possible uses of plaintiffs' property.

Furthermore, generally, "the adoption of a resolution or the entering into negotiations to acquire land does not pass any interest in that land." Griffin v. City of North Chicago, 112 Ill. App. 3d 901, 905 (1983). "The fact that at some future time a municipal corporation, with power of

eminent domain, may require the land of a private owner, is one of the conditions on which the owner holds land in this State. Entering into negotiations for the purchase, and filing of a petition to condemn, vests no interest in land." Eckhoff v. Forest Preserve District of Cook County, 377 Ill. 208, 214 (1941). Additionally, the "taking *** of land by eminent domain" is not accomplished by passing resolutions or ordinances or by negotiating with the owner for the purchase of it or by serving notice to the owner that land may be required for public purposes. Eckhoff, 377 Ill. at 214. Accordingly, we are not persuaded that count I states a taking cause of action.

### Count II--Constitutional Deprivation of Property Rights

In count II, brought pursuant to section 1983, plaintiffs alleged that the District and Morton violated their substantive due process rights by acting together to use the District's power of eminent domain to deprive plaintiffs of property rights. The trial court found that Morton's action of petitioning the District was privileged under the first amendment and the Noerr-Pennington doctrine right to petition and that there could not be a conspiracy to commit an unlawful act when Morton was within its right to petition the District and the District, a governmental body, is charged with the obligation to listen to its constituents. Plaintiffs do not dispute that Morton's alleged action is generally entitled to protection under the first amendment and the Noerr-Pennington doctrine. Rather, they argue that Morton's and the District's conspiratorial conduct falls within the very narrow "sham" exception to Noerr-Pennington immunity.

The Noerr-Pennington doctrine stems from Supreme Court opinions holding that parties who petition the government for governmental action favorable to themselves cannot be sued under the Sherman Antitrust Act (15 U.S.C. §1 et seq. (2000)), even though their actions are motivated by anticompetitive intent. Pennington, 381 U.S. at 670, 14 L. Ed. 2d at 636, 85 S. Ct. at 1593. This

doctrine has been extended to section 1983 actions. See Tarpley v. Keistler, 188 F.3d 788, 794 (7th Cir. 1999). "This doctrine has [also] been extended to local governmental bodies to immunize them from suit." Village of Lake Barrington v. Hogan, 272 Ill. App. 3d 225, 236 (1995); see Monarch Entertainment Bureau, Inc. v. New Jersey Highway Authority, 715 F. Supp. 1290, 1301-03 (D.N.J.1989). Courts have carved out an exception to the doctrine, for "sham" petitioning activity. California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 513, 30 L. Ed. 2d 642, 648, 92 S. Ct. 609, 613 (1972); Harrison v. Springdale Water & Sewer Comm'n, 780 F.2d 1422, 1428 (8th Cir.1986). To constitute a "sham," the activity must be "objectively baseless in the sense that no reasonable [petitioner] could realistically expect success on the merits." Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49, 60, 123 L. Ed. 2d 611, 624, 113 S. Ct. 1920, 1928 (1993); see Hometown Properties, Inc. v. Fleming, 680 A.2d 56, 60-61 (R.I. 1996).

The sham exception applies only when a defendant petitions the government with no realistic expectation of a favorable result, but merely to force expense and delay on the other party. An example is the filing of a frivolous objection to a competitor's license application, with no expectation of achieving denial of the license but simply to impose expense and delay. See City of Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 380, 113 L. Ed. 2d 382, 398, 111 S. Ct. 1344, 1354 (1991).

We find the sham exception inapplicable here. Plaintiffs alleged that Morton petitioned the District to acquire the subject property for the private benefit of Morton and to transfer the property to Morton for management after acquisition was accomplished; that Morton suggested to the District that it use its condemnation power to have Morton undertake possession and management; that Morton met with representatives of the District to discuss having the District use its condemnation power with the intent that the District would ultimately have the property transferred to Morton; and

that the purpose of the condemnation action was to have the subject property turned over to Morton. Plaintiffs assert that the complaint for condemnation was ultimately filed by the District at the urging of Morton and for Morton's benefit and that it ultimately served Morton's goal of stalling and preventing the proposed development of the subject property. Moreover, plaintiffs assert that the voluntary dismissal of the suit serves as evidence that neither Morton nor the District ever truly desired to physically acquire the subject property but that they conspired to forever preclude development of the property and to harm and harass plaintiffs by forcing them to sell the property to the District or by destroying the developmental potential of the property.

Plaintiffs' claim against Morton alleges the type of governmental petitioning that is protected by the Noerr-Pennington doctrine. Plaintiffs' claim that Morton petitioned the District to take action either to acquire the property for Morton or to preclude development of the property is simply another way of describing an attempt by Morton to preserve open space, which necessarily involves preventing development. Morton's request that the District exercise eminent domain against the property was not "objectively baseless." It was Morton's right to petition the District to exercise eminent domain. It was the District's right to listen to Morton's petition, as it is within the District's statutory authority to exercise eminent domain (see 70 ILCS 805/5 (West 2006)). These actions certainly do not constitute a sham.

Moreover, plaintiffs did not, and cannot, allege that the District's condemnation proceeding was "objectively baseless," because, as plaintiffs acknowledge: the District has "powers of eminent domain to acquire involuntarily real estate within Du Page County for forest preserve purposes." Thus, the District had a realistic expectation of succeeding in its condemnation action, thereby rendering the "sham" exception inapplicable. Because of the District's statutory right to condemn property, there was substantial likelihood of the District succeeding on the merits in its

condemnation action. Thus, Morton was protected by the Noerr-Pennington doctrine to petition the District, and the doctrine reciprocally protects the District, which had a right to act on the petition of its constituent. We find that count II was properly dismissed.

Count III--Ultra Vires Acts

Plaintiffs next contend that the Phase I ordinance and the Abandonment ordinance are ultra vires acts, beyond the scope of powers expressly granted to the District in the Downstate Forest Preserve District Act (Act) (70 ILCS 805/0.001 et seq. (West 2006)). The trial court dismissed count III, finding that the ordinances are within the lawful parameters of the statute. Plaintiffs argue that the ordinances are ultra vires because the Act does not conspicuously grant forest preserve districts power to seek precondemnation injunctions or to state in abandonment ordinances that abandonment is not for lack of necessity and that acquisition is important in the future.

Section 3(a) of the Act provides that the affairs of a district shall be managed by a board of commissioners. 70 ILCS 805/3(a) (West 2006). "The board shall be the corporate authority of such forest preserve district and shall have power to pass and enforce all necessary ordinances, rules and regulations for the management of the property and conduct of the business of such district." 70 ILCS 805/8(a) (West 2006).

The court in Houston v. Village of Maywood, 11 Ill. App. 2d 433, 437-38 (1956), interpreted section 8(a) as a broad provision that necessarily implies that the board is vested with the discretion to determine what course of action will achieve the most successful and efficient management of the district's property. Because "management of the district's property" is one of the powers vested in a forest preserve district's board of commissioners, it logically follows that the interpretation applied by Houston should be true of the other powers vested in the board. Thus, section 8(a) also necessarily implies that the board is vested with the discretion to determine what course of action

will most successfully and efficiently conduct the business of the district. We agree with the District that its board of commissioners was properly exercising its discretion in conducting the District's business when it enacted the Abandonment ordinance and the Phase I ordinance.

Although statutes granting powers to forest preserve districts are strictly construed, "a power may be implied even though it is not absolutely indispensable to the effective exercise of those powers expressly granted." Houston, 11 Ill. App. 2d at 437. If a particular course of conduct will help achieve the purposes of a forest preserve district by aiding in the conduct of the business of the district, and will not be inconsistent with any of the provisions of the Act, "then such course of conduct cannot be said to be outside the implied powers of the district board." Houston, 11 Ill. App. 2d at 438.

Here, the District's enactment of neither the Abandonment ordinance nor the Phase I ordinance was outside the broad grant of implied powers vested with the District's board, and therefore neither was ultra vires. The board decided that it could most successfully and efficiently conduct the business of the District by including in the Abandonment ordinance a statement that abandonment was not for lack of necessity and that acquisition of the land in the future would be important to furthering the statutory purposes of the District. This decision is not inconsistent with any provision of the Act, and the Act does not prohibit such a statement. Moreover, it is well established that a board of commissioners has the power to decide whether it is "necessary" that certain land be taken for forest preserve district purposes. See, e.g., Goldman v. Moore, 35 Ill. 2d 450, 453 (1966). A district has the power to abandon a condemnation action for reasons other than lack of necessity for the taking. See Department of Transportation v. Veach Oil Co., 22 Ill. App. 3d 229, 231 (1974). Furthermore, a board of commissioners has the power to decide to initiate a new condemnation action even though a previous condemnation action had been dismissed. See Forest

Preserve District of Will County v. Vanderlaan, 226 Ill. App. 3d 692, 695 (1992).  Thus, where the District's board of commissioners decided to abandon the condemnation action for a reason other than lack of necessity, it was not unreasonable for the board to state so in the Abandonment ordinance.  Nor was it unreasonable for the board to state that it is reserving the power that it has under the Act to possibly acquire the property in the future.  See People ex rel. Kucharski v. McGovern, 42 Ill. 2d 119, 127-28 (1969) ("[l]ong-range planning is a necessary aspect of proper overall development of forested lands").  Accordingly, we find that count III was properly dismissed.

Count IV--Quiet Title

Count IV of plaintiffs' complaint sought to quiet title to plaintiffs land.  The trial court dismissed count IV, finding that "there was no assertion of title which could even remotely be constituted as a cloud upon the title."  Nevertheless, plaintiffs assert that the Phase I ordinance and the Abandonment ordinance constitute "an assertion of title by the [District] to ownership of some rights over the property and are sufficient to serve as a semblance of title to the property."

An action to quiet title in property is an equitable proceeding in which a party seeks to remove a cloud on his title to the property.  Illinois District of American Turners, Inc. v. Rieger, 329 Ill. App. 3d 1063, 1071 (2002).  To constitute a cloud, there must be a semblance of title that is, in fact, unfounded and casts a doubt upon the validity of the record title.  Rieger, 329 Ill. App. 3d at 1072.  "[A] quiet title action does not lie where the defendant has not made an adverse claim to an interest in the plaintiff's property."  Rieger, 329 Ill. App. 3d at 1072.

Plaintiffs do not allege that either the Phase I ordinance or the Abandonment ordinance purports to give the District a semblance of title that casts doubt upon the validity of their record title.  Nor do plaintiffs allege that the District has made an adverse claim to an interest in their property.  The Phase I ordinance is inoperative and cannot constitute a semblance of title or an

adverse claim.  The Abandonment ordinance does not assert that the District has any right or claim to the property.  As the District points out, if plaintiffs would obtain the proper permits, plaintiffs could begin bulldozing trees on their property at any time and the District would be powerless to stop them based on either of the ordinances.  Neither ordinance has the legal effect that plaintiffs ascribe to it, including constituting a semblance of title or an adverse claim to plaintiffs' property.  We agree with the trial court and find that count IV was properly dismissed.

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

HUTCHINSON and GILLERAN JOHNSON, JJ., concur.